IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHRISTOPHER SHIRLEY,

                            Plaintiff,

        v.

JED CAPITAL, LLC and JOHN
HARADA,

                            Defendants.

Case No. 09 C 7894

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants' Motion to Dismiss under Federal
Rules of Civil Procedure 12(b)(1), 12(b)(6), 9(b), and 17.  For the
following reasons, the Motion to Dismiss is granted in part and
denied in part.

## I.  BACKGROUND

Christopher Shirley ("Shirley"), a member of JED Capital, LLC
("JED"), is suing JED and its manager, John Harada, on seven counts:
(1) breach of contract, (2) fraud in the inducement, (3) breach of
fiduciary duty under the Illinois Limited Liability Company Act, (4)
for an accounting and damages, (5) violation of the Illinois Wage
Payment and Collection Act, (6) violation of federal securities laws,
and (7) violation of the Racketeer Influenced Corrupt Organizations
Act ("RICO").

JED is an investment company that participates in, among other
things, automated trading of futures, equities, and foreign exchange

instruments.  Before January 1, 2007, Plaintiff Christopher Shirley, while working for various investment companies, developed several methods and programs for automated securities trading, including a Liquidity Replenishment Program ("LRP").  In March 2007, Shirley began working full-time for JED. Shirley's efforts using LRP produced millions of dollars in income for JED.

In July 2007, John Harada ("Harada"), JED'S manager, persuaded Shirley to convert $200,000 owed to him by JED, plus up to $100,000 in future earnings, into equity in JED, making Shirley a 10% owner-member of the LLC.  Shirley alleges that Harada promised to use the money to support LRP.  Shirley alleges that Harada failed to tell him that JED could not pay its bills and had no revenues except those brought in by Shirley.  Harada said that if Shirley did not agree, JED would fire him and continue to use LRP without him.  Shirley reluctantly agreed to Harada's suggestion. Shirley became a member of JED, but Harada retained all decision-making authority for the LLC.

Shirley continued to work for JED, producing profits in the millions of dollars.  In September 2008, Harada persuaded Shirley to invest an additional $250,000 into JED in order to expand the LRP trade to London, making Shirley a 20% member.  Shirley made the investment on the specific agreement that the money would be used solely to expand the company's trading capabilities on the London stock exchange.  Shirley alleges that Harada failed to tell him that JED was in the process of repaying an investment whereby it would become insolvent, that JED could not pay its bills, that Harada had

"sucked" money out of JED to finance other ventures, and that JED needed Shirley's money for its daily survival. After Shirley made the additional investment, Harada allegedly failed to expand the company into the London market. Shirley alleges that this failure cost him and JED $3,000 daily in lost profits.

Shirley also alleges that Harada failed to pay him a $10,000 monthly salary that Shirley was contractually bound to receive in addition to his share of the profits he generated. Harada also failed to live up to his promises to provide financial and personnel support for the LRP program. Shirley alleges that this failure was based on JED's and Harada's intention to "freeze" Shirley out of JED and concentrate JED's resources on other ventures, in violation of their fiduciary and contractual obligations to Shirley.

Shirley decided to leave JED. On August 5, 2009, Shirley and Harada agreed to shut down the LRP program, close JED, and disburse JED's capital to the remaining members. Shirley received his share of the profits, but not his unpaid salary. Despite Shirley and Harada's agreements to shut down LRP and JED, JED allegedly recommenced running trades on the LRP program after Shirley left. JED has not accounted to Shirley for his share of the profits Shirley believes he should have received as a 20% member of JED.

Shirley alleges numerous improprieties committed by Harada as manager of JED, including using JED assets to fund Harada's other business ventures and borrowing JED funds for personal and family purposes.

Only Counts 6 (securities violation) and 7 (RICO) of the Amended Complaint are based on federal law. Defendants JED and Harada argue that Counts 6 and 7 do not state a claim for which relief may be granted and that the Court therefore does not have subject matter jurisdiction. Shirley responds that the Court has diversity jurisdiction even if it does not have federal issue jurisdiction – a point that JED disputes. JED argues that, even if the Court does have jurisdiction, Counts 1 through 4 must be dismissed under Rule 12(b)(6) or Rule 17.

## II. <u>LEGAL STANDARDS</u>

### A. Subject Matter Jurisdiction

A federal court must have federal-question jurisdiction under 28 U.S.C. § 1331 or diversity jurisdiction under 28 U.S.C. § 1332. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513 (2006). If it has neither, it must dismiss the case under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction.

### B. Rule 12(b)(6)

Under Rule 12(b)(6), a court must dismiss a plaintiff's claim if it does not include sufficient facts to state a claim to relief that is plausible on its face. *Justice v. Town of Cicero*, 577 F.3d 768, 771 (7th Cir. 2009). In considering a motion to dismiss, a court must accept a plaintiff's allegations as true and view them, along with any reasonable inferences drawn from them, in the light most favorable to the plaintiff. *Id.*

## C. Rule 9(b)

Rule 9(b) provides, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." A cause of action may be dismissed for failing to plead fraud or mistake with particularity. *See Hayduk v. Lanna*, 775 F.2d 441, 443-45 (1st Cir. 1985).

## III. **DISCUSSION**

### A. Subject Matter Jurisdiction

The Court addresses this threshold issue first. If Defendants are correct that Plaintiff fails to state a claim under federal securities laws or RICO, then there is no federal question jurisdiction. If this is so, the Court must consider whether it has diversity jurisdiction.

#### 1. *Federal Question Jurisdiction*

##### a. *Securities Violation (Count 6)*

###### i. The Agreements as Investment Contracts

The crux of this debate is whether Plaintiff's investments in JED constitute an "investment contract." If not, federal securities laws do not apply to Plaintiff's investments. *See* 15 U.S.C. § 77b(a)(1). The Supreme Court has devised a test for defining investment contracts in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). Agreements are investment contracts, and therefore "securities," if they reflect (1) an investment of money (2) in a common enterprise (3) with profits to come solely from the entrepreneurial or

managerial efforts of others. *Id.* at 301; *Nelson v. Stahl*, 173 F.Supp.2d 153, 164 (S.D.N.Y. 2001). Only the third prong is contested in this case.

One of the principal purposes of the federal securities laws is to "protect investors by promoting full disclosure of information necessary to informed investment decisions." *Bailey v. J.W.K. Props., Inc.*, 904 F.2d 918, 921 (4th Cir. 1990). Because the securities statutes are remedial in nature, they should be read broadly. *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973). The word "solely" should not be interpreted strictly, but rather realistically, and should turn on whether the actions of those other than the investor are the "undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Id.*

Furthermore, the *Howey* test is to be tempered by the requirement that it is to be applied in light of the substance of the relationship rather than the form. *See Int'l Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 558 (1979). The Securities Exchange Act's definition of a "security" is flexible and is designed to adapt to the "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299. Whether an LLC interest is a security depends on the particular facts of the investment arrangement and is a question that courts must determine on a case-by-case basis after taking into account the particular facts and circumstances of the

investment arrangement.  *Cogniplex, Inc. v. Ross*, 2001 WL 436210, *9 (N.D. Ill. 2001).

Interest in an LLC may be a security where the members are so dependent on a manager that they cannot replace him or exercise ultimate control without him.  *Nelson*, 173 F.Supp.2d at 165. Plaintiff argues that he had a securities interest in JED by pointing out the undisputed fact that JED was a "manager-managed," as opposed to a "member-managed" LLC, with Harada as the manager.  Plaintiff's investment agreements ratified his original Employment Agreement, by which he received commissions for his work.  Although Plaintiff ran the LRP, he had no control over JED's expenditures and had no recourse within the company when Harada failed to provide the resources he had promised to the LRP.  Since Harada was two-thirds owner of JED, membership meetings could not be called without his consent. As manager, Harada had the sole power to authorize distributions and had veto power over any change in manager. The Operating Agreement had no provision for removal of the manager for cause.  Plaintiff had no control over JED's business and could not bind the company.  Because interest in a manager-managed LLC is more likely to be a security interest where the members' ability to exercise management control is effectively non-existent, *see KFC Ventures, L.L.C. v. Metaine Med. Equip. Leasing Corp.*, 2000 WL 726877, *2 (E.D. La. 2000), these facts weigh in favor of Plaintiff's agreement with JED being an investment contract.

Defendants contend, however, that Plaintiff's argument fails because he was investing money in JED for the sole purpose of dedicating those funds entirely to the LRP, the part of JED *that Plaintiff controlled*, not so that Plaintiff could profit from the efforts of others. Furthermore, Defendants argue, as Plaintiff claims to have been producing almost all the profits of an otherwise-insolvent company, he can hardly claim to be a passive investor who invested his money while expecting to earn profits from the efforts of others.

This set of facts creates a close call as to whether Plaintiff's investment in JED was a security interest. As this Court has noted, LLC organizational structures "defy formulaic application of the *Howey* test." *Cogniplex*, 2001 WL 436210 at *10. Plaintiff had control over the workaday operations of the LRP and was responsible for the lion's share of the income of JED. For this work, he received commissions and was promised a salary.

But the history of the relationship indicates that Shirley started out at JED as an employee who received commissions – 25% of the first $150,000 of net profit and loss generated by Plaintiff's trading strategies in a year and 50% of the net profit and loss over $150,000. Even when he became a member-investor, Shirley was still an "employee," and his pay scheme as employee remained exactly the same. Therefore, it is misleading to focus on the commissions Plaintiff received, as the facts show that he was owed these as an employee.

Naturally, when Plaintiff invested money in JED, he had a right to expect something in addition to what he was getting as an employee, namely, an equity interest in JED as a whole.  That meant he had an interest (eventually, a 20% interest) in those LRP profits that did *not* flow to him as commissions and an interest in any other profits JED might be making.  Although he was generating most of the profits, he had no control over them once they went into JED's coffers.

The "legal right to a voice in partnership matters" is a key issue in determining activity or passivity.  *See Nelson*, 173 F.Supp.2d at 165 (finding investment in LLC not a securities interest where investors had direct authority over management of LLC).  Obviously, Plaintiff had no voice in controlling the LLC as a whole.  By investing in JED, Plaintiff expected to acquire a 20% interest in JED's total profits (including those profits based on his own efforts and those profits based on the efforts of other members – if there had been any such profits), but the disbursement of any profits was entirely under Harada's control.  Plaintiff had no control over whether the funds would be frittered away or used to increase the value of JED.  Plaintiff may have had control over his job earnings, but he had essentially no control over his "investment."

Thus, Plaintiff was a passive investor as far as any additional profits from JED were concerned.  Anything he got above and beyond his commissions and salary, which he would have gotten anyway as an employee, was dependent on how Harada managed JED's assets.  The

Court therefore finds that, under the unusual circumstances of this case, Plaintiff's agreement to invest in JED qualifies as an "investment contract" for purposes of federal securities laws.

### ii. Sufficiency of the Fraud Allegation under Rules 12(b)(6) and 9(b)

In order for Plaintiff's claim for securities fraud to be legally sufficient, it must meet the requirements of Rule 12(b)(6) and Rule 9(b). Plaintiff alleges that Defendants violated section 10(b) of the Securities and Exchange Act of 1934 (as amended, 15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5). In alleging such violation, a plaintiff must allege with particularity (1) that defendant made an untrue statement of material fact or omitted a material fact that rendered the statements made misleading ("any manipulative or deceptive device or contrivance," 15 U.S.C. § 78j(b)), (2) in connection with a securities transaction, (3) with intent to mislead, (4) causing damages. *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 943 (7th Cir. 1989); FED. R. CIV. P. 9(b).

Plaintiff has alleged, among other things, that in September 2008, Harada induced him to invest $250,000 in JED for its London expansion but omitted to tell Plaintiff the material facts that JED was in the process of repaying an investment whereby it would become insolvent (Plaintiff names a specific investor and amount in his Amended Complaint), that JED could not pay its bills, that Harada had used JED money to finance his other business ventures (the Amended Complaint specifically names the business ventures), and that JED

needed Plaintiff's money for its daily survival.  These are certainly material facts to someone contemplating an investment in a business. Plaintiff alleges that had he known the above facts, he would not have invested the $250,000.  Plaintiff has alleged lost profits of $3,000 a day to JED and to himself based on Harada's mishandling of JED's funds.  The Court finds the pleading of securities fraud legally sufficient under Rules 9(b) and 12(b)(6).  *Cf. Stahl*, 173 F.Supp.2d at 168 (finding securities fraud sufficiently pled where defendant was alleged to have misrepresented company's financial condition).  The motion to dismiss Count 6 is therefore denied.

Because Plaintiff has stated a valid claim under U.S. securities laws, the Court finds that it has subject matter jurisdiction.  *See* 28 U.S.C. § 1331.

Defendants move to strike Plaintiff's allegations in Count 6 that Defendants made false statements about the use of his investment proceeds and threatened to dismiss him in order to induce him to invest.  Defendants argue that these allegations do not constitute fraudulent actions.  The motion is denied.  *See* FED. R. CIV. P. 12(f); 15 U.S.C. § 78j(b) (prohibiting use of manipulative or deceptive devices in securities transactions); *Smith v. AVSC Int'l Inc.*, 148 F.Supp.2d 302, 317 (S.D.N.Y. 2001) ("[M]otions to strike are generally disfavored and will not be granted unless the matter asserted clearly has no bearing on the issue in dispute.").

*b. RICO violation (Count 7)*

Defendants argue that Plaintiff fails to state a claim for RICO violation, citing Rule 12(b)(6) and Rule 9(b).

i. Pattern of "racketeering activity"

It is unlawful for a person associated with an enterprise engaged in interstate commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through "a pattern of racketeering activity." 18 U.S.C. § 1962(c). "Racketeering activities" are defined in 18 U.S.C. § 1961(1), which provides an exhaustive list. Defendants argue that the misdeeds Plaintiff attributes to them are not racketeering activities under section 1961. For example, Plaintiff cites securities fraud as a racketeering activity, but such activity is expressly excluded as a predicate act for civil RICO purposes unless the person has been criminally convicted of the alleged securities fraud. 18 U.S.C. § 1964(c).

Plaintiff also cites common law fraud, extortion, theft, tax fraud, and embezzlement as racketeering activities, but, without something more, only extortion is defined as a racketeering activity in section 1961. The "something more" that Plaintiff alleges involves mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343, both of which are racketeering activities under section 1961. The mail fraud statute applies only where the defendant uses the U.S. mails as "part of the execution" of a fraudulent scheme. *Schmuck v. United States,* 489 U.S. 705, 710

(1989).  The wire fraud statute is identical to the mail fraud statute, except that it applies to communications transmitted by wire, *i.e.*, telephone, radio, or television, and does not apply to intrastate communications.  *Gintowt v. TL Ventures,* 226 F.Supp.2d 672, 677 (E.D. Pa. 2002).  To support a mail or wire fraud conviction, a transmission "must further the scheme to defraud or be incident to an essential part of that scheme."  *Id.*

In Paragraphs 35 through 39 of his Amended Complaint, Plaintiff alleges that Harada paid the bulk of the expenses of Need To Know Network ("NTKN"), one of Harada's other businesses, from JED's account and never reimbursed JED; paid NTKN salaries from JED funds, which were never reimbursed; made improperly documented loans to NTKN in excess of $500,000, which have not been repaid; paid $150,000 to a company owned by a JED member to cover up a bad trade; sold NTKN to a third party without reimbursing JED for sums it had loaned to NTKN; loaned personal funds to JED, then converted the loans to equity, and the equity to debt; and paid himself $61,000 interest on the purported loans.  Plaintiff alleges that these incidents occurred between July 13, 2007 and August 1, 2009, except the sale of NTKN, which occurred around December 1, 2009. Plaintiff alleges that Harada and JED often made such transactions through electronic funds transfers.  Plaintiff also alleges that Harada used electronic transmissions and/or mail to issue false and misleading tax forms in 2007 and 2008.  Harada also allegedly employed electronic transfers

to use JED funds for personal and family uses and to support his other businesses.

Plaintiff certainly alleges a pattern of continuing and related questionable business practices that appear to be a regular way of doing business. *See H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239-43 (1989). But because he is alleging *fraudulent* practices done by mail or wire, Plaintiff must meet the heightened particularity requirements of Rule 9(b) for pleading fraud. *See Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 599 (7th Cir. 2001). To satisfy this standard, a RICO plaintiff must allege the identity of the person who made the representation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated. *Vicom, Inc. v. Harbridge Merchant Serv., Inc.,* 20 F.3d 771, 777 (7th Cir. 1994). Moreover, because a RICO plaintiff must allege at least two predicate acts of fraud, he must satisfy the requirements of Rule 9(b) twice. *Emery v. Am. Gen. Fin., Inc.,* 134 F.3d 1321, 1323 (7th Cir. 1998).

Plaintiff's Amended Complaint omits many needed details. Take, for example, the allegation that Harada paid the bulk of NTKN's expenses from JED's account and never reimbursed JED. What misrepresentation did Harada make? For all we know from Plaintiff's Amended Complaint, Harada might have transferred funds to NTKN with the complete knowledge and approval of JED's members. Then where would be the fraud? Plaintiff alleges that Harada paid $150,000 to a company owned by a JED member to cover up a bad trade. Which

company?  Owned by which JED member?  What exactly was the misrepresentation, and to whom?  How was an electronic transfer used to further the fraud?  As for the tax forms, what did they say that was false or misleading?  Plaintiff alleges that Harada used JED assets for personal and family expenses, but gives no specific examples.  How were these fraudulent, and how were electronic transfers used to further the fraud?

Plaintiff alleges in a general way that numerous investments and transfers were made through the use of electronic funds transfers. This is not specific enough.  Plaintiff must state which transfers he believes were made electronically or by mail and how they furthered the fraud.  Furthermore, for the wire fraud statute to apply, the transfers must be made across state lines.  Plaintiff makes no allegation to that effect.

For these reasons, the Court finds that Plaintiff has failed to plead a pattern of racketeering activity with the specificity required by Rule 9(b).

ii.  Distinguishing the RICO Person
from the RICO Enterprise

The RICO statute targets a "person" who is associated with an "enterprise." 18 U.S.C. § 1962(c) ("It shall be unlawful for any person employed by or associated with any enterprise  . . . ").  The Seventh Circuit has held that the "person" and the "enterprise" must be distinct entities.  *Haroco Inc. v. Am. Nat'l Bank & Trust Co. of Chicago*, 747 F.2d 384, 400-02 (7th Cir. 1984).

Plaintiff's Amended Complaint seeks to hold both JED and Harada liable for RICO violations.  It also states that for RICO purposes, "JED and Harada constitute the operative racketeering enterprise." It would appear from Plaintiff's narrative that he means to target Harada as the "person" who used the "enterprise" of JED to engage in racketeering activities, but, as written, the Amended Complaint treats JED and Harada as both persons and enterprises.  This is an additional reason for dismissing this count.

Count 7 is dismissed without prejudice for Plaintiff to amend his complaint.

## 2.  Diversity jurisdiction

Because the Court has jurisdiction based on an issue of federal securities laws, the Court need not consider whether it has diversity jurisdiction.

## B.  Breach of Contract (Count 1) and Fraud in the Inducement (Count 2)

Because Plaintiff's state law claims arise out of a "common nucleus of operative facts" with the federal claim in the case, the Court has jurisdiction over the state law claims as well.  28 U.S.C. § 1367(a); *United Mine Workers v. Gibbs,* 383 U.S. 715, 725 (1966).

## 1.  Breach of Contract

Plaintiff alleges that Defendants breached their contract when they failed to honor their promises to provide resource support for the LRP, thereby preventing the LRP from reaching its full potential; this cost Plaintiff millions of dollars.  But there is no mention in

the contracts between Plaintiff and Defendants of financial or resource support for the LRP. Apparently, Harada's promises on that score were made orally and do not appear in any written contract.

Under Illinois law, a written contract is presumed to include all material terms agreed upon by the parties, and prior negotiations or representations are merged into that agreement; extrinsic evidence, parol or otherwise, of earlier understandings and negotiations is generally inadmissible to alter, vary, or contradict the written contract. *K's Merch. Mart, Inc. v. Northgate Ltd. P'ship*, 835 N.E.2d 965, 971 (Ill.App.Ct. 2005). There being no legally cognizable contractual requirement for Defendants to provide support for the LRP, Plaintiff has no claim against them on that point. Count 1 is therefore dismissed.

### 2. *Fraud in the Inducement*

Plaintiff alleges that Defendants fraudulently induced him to make his two large investments in JED by falsely representing that the funds would be used to support, expand, and enhance the LRP. Defendants argue that only misrepresentations of present or existing fact, not promises of future performance, are actionable under Illinois law. *See Bower v. Jones*, 978 F.2d 1004, 1011 (7th Cir. 1992).

While this is the general rule in Illinois, there is a well-recognized exception "where the false promise or representation of future conduct is alleged to be the scheme employed to accomplish the fraud." *Steinberg v. Chicago Med. Sch.*, 371 N.E.2d 634, 641 (Ill.

1977).  "Where a party makes a promise of performance, not intending to keep the promise but intending for another party to rely on it, and where that other party relies upon it to his detriment, the false promise will be considered an intended scheme to defraud the victim and will be actionable."  *Concord Indus., Inc. v. Harvel Indus. Corp.*, 462 N.E.2d 1252, 1255 (Ill.App.Ct. 1984).

Plaintiff's allegations that Defendants persuaded him to invest in JED by making promises that they had no intention of keeping while concealing JED's true financial condition, and that Plaintiff relied on those promises in agreeing to invest in JED, do indeed state a cause of action under Illinois law.  The motion to dismiss Count 2 is therefore denied.

## C.  Rule 17 Motions

Defendants move to dismiss Counts 3 and 4 on the basis that the LLC is the real party in interest and that Plaintiff therefore has no standing to bring these claims.  Federal Rule of Civil Procedure 17(a)(1) provides that "[an] action must be prosecuted in the name of the real party in interest."  A court must dismiss a cause where the plaintiff is not the real party in interest, after allowing a reasonable opportunity for the real party in interest to be joined or substituted under Rule 17(a)(3).  *See McWhirter v. Otis Elevator Co.*, 40 F.Supp. 11 (W.D.S.C. 1941) (holding that Rule 17 is mandatory and defendant has right to be sued by real party in interest).

## 1. Illinois LLC Act *(Count 3)*

Plaintiff brings a claim against Harada for alleged violations of his fiduciary duties toward JED under the Illinois LLC Act, 805 Ill. Comp. Stat. 180/15-3. Generally, a plaintiff should seek redress for such injuries through a derivative suit on behalf of the company, not through a direct suit on his own behalf. *See, Elmhurst Consulting, LLC v. Gibson*, 219 F.R.D. 125, 127 (N.D.Ill. 2003).

An LLC member may, however, bring an action in the right of an LLC after the members or managers with authority to bring such an action have refused to do so, or when demanding that they bring such an action would have been futile. 805 Ill. Comp. Stat. 180/40-1. A plaintiff in a derivative action must plead with particularity either the demand made to initiate the action or the reasons why demand would have been futile. 805 Ill. Comp. Stat. 180/40-10.

Plaintiff does not claim to have made a demand on the relevant director of the LLC (in this case, Harada); rather Plaintiff claims that such a demand would be futile. Under Illinois law, it is within the trial court's discretion to determine whether the demand requirement is excused. *Powell v. Gant*, 556 N.E.2d 1241, 1245 (Ill.App. Ct. 1990). The doctrine of futility excuses demand where a majority of the directors are the alleged wrongdoers. *Id.* Demand futility is established where a plaintiff sufficiently alleges facts that raise a reasonable doubt as to (1) the directors' disinterestedness or independence or (2) whether the challenged transaction was the product of a valid business judgment. *In re*

*Abbott Labs. Derivative S'holder Litig.*, 325 F.3d 795, 807 (7th Cir. 2003).

Plaintiff unquestionably alleges that Harada, the sole manager of JED, is the wrongdoer. Plaintiff alleges that Harada withheld JED's true financial condition when persuading Plaintiff to invest in JED; threatened to fire Plaintiff if he didn't invest; made false promises about how Plaintiff's investment money would be used; used JED funds to finance his other businesses; re-opened JED after agreeing to close it; and failed to distribute any profits to Plaintiff after re-opening JED. Taken together, these allegations raise reasonable doubts about Harada's disinterestedness, *i.e.*, his undivided loyalty to JED's member-investors. The Court finds that Plaintiff has sufficiently pled that a demand would be futile. The motion to dismiss Count 3 is therefore denied.

### 2. Accounting and Damages (Count 4)

Generally, a court will exercise jurisdiction for purpose of ordering an accounting when discovery is necessary, when complicated or mutual accounts are involved, or when a fiduciary relationship exists between parties. *Metro-Goldwyn-Mayer, Inc. v. Antioch Theatre Co., Inc.*, 367 N.E.2d 247, 255 (Ill.App. Ct. 1977). Illinois courts have held that an order for an accounting is within the court's discretion. *Newton v. Aitken*, 633 N.E.2d 213, 218 (Ill.App. Ct. 1994). Plaintiff sufficiently pleads a cause of action for accounting by alleging that Harada, who had a fiduciary relationship

with JED and its members, re-opened JED and failed to distribute the profits to its members.

Less recent Illinois case law suggests that an action for equitable accounting will not lie until a plaintiff has made a demand for an accounting or established that a demand would be futile. *See, Am. Sanitary Rag Co. v. Dry*, 105 N.E.2d 133, 135 (Ill.App. Ct. 1952); *Patterson v. N. Trust Co.*, 170 Ill.App. 501 (Ill.App. Ct. 1912). Even if this rule were to apply, the Court finds that any demand would be futile, as explained above. The motion to dismiss Count 4 is therefore denied.

## IV. CONCLUSION

For the reasons stated herein, the Court rules as follows:

1. Defendants' Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(1) is denied. The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

2. Defendants' Motions to Dismiss Counts 1 and 7 are granted. Counts 1 and 7 are dismissed without prejudice. Plaintiff has leave to amend his Complaint within four weeks of this order.

3. Defendants' Motions to Dismiss Counts 2, 3, 4, and 6 are denied.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

**DATE:** 7/8/2010